**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
UNITED STATES OF AMERICA        )
                                )
                                )
              v.                )        1:11CR162-1
                                )
                                )
RICHARD ANTHONY KAMINSKY        )
```

**MEMORANDUM OPINION AND ORDER**

On June 3, 2011, a federal grand jury for this district indicted the defendant for two counts of falsely denying a prior adjudication of mental defectiveness and/or a prior commitment to a mental institution on a firearm acquisition form in violation of 18 U.S.C. § 922(a)(6) and one count of possessing a firearm after a prior commitment to a mental institution in violation of 18 U.S.C. § 922(g)(4). (Docket Entry 1.) The case thereafter came before the Court for a hearing on an oral motion for detention by the United States, pursuant to 18 U.S.C. § 3142(f)(1)(E). (See Docket Entry dated July 27, 2011.) At the end of the hearing, the Court stated that it would review the evidence cited and submitted by the parties and either would enter a written order of detention (as required by 18 U.S.C. § 3142(i)(1)) or would set the matter back on for review of appropriate release conditions. (See id.) The Court now issues this written order of detention based both on risk of non-appearance and risk of danger.

PROCEDURAL BACKGROUND

In advance of the detention hearing, a United States Probation Officer assigned to the Pretrial Services Unit prepared a report regarding the defendant's history, residence, family ties,

employment history, financial resources, health (including as it relates to mental health and substance abuse issues), and prior record. Both parties reviewed that report and the defendant noted no objections to its factual information, which the Court therefore adopts (as supplemented by the hearing evidence).

The defendant was "afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear[ed] at the hearing, and to present information by proffer or otherwise," 18 U.S.C. § 3142(f)(1). He declined to testify or to present any witnesses, but (through his counsel) did proffer some information about himself, as well as two pieces of documentary evidence:

1) Defendant's Exhibit 1, a letter from the Men's Program Manager of the Winston-Salem Rescue Mission dated July 13, 2011, regarding a residential placement for the defendant; and

2) Defendant's Exhibit 2, which consists of copies of Durham Police Department reports regarding an incident on October 12, 2010, when the defendant reported the robbery of his book-bag.

The United States, in turn, called (and the defendant, through his counsel, cross-examined) a federal agent who had participated in the investigation of and had reviewed law enforcement reports about the case. In addition, the United States drew the Court's attention to civil litigation the defendant had instituted in the Eastern District of Missouri and in this Court. Finally, the United States introduced copies of these Illinois court records:

1) Government's Exhibit 1, which contains copies of documents related to the defendant's conviction for the misdemeanor offense

of harassment by telephone in Madison County, Illinois, on September 8, 2008, and the entry of an order for his arrest for violation of the resulting probationary sentence (which matters were not captured in the Pretrial Services Unit's report); and

2) Government's Exhibit 2, which includes copies of documents related to a judicial determination of the defendant's unfitness to stand trial and an order remanding the defendant to the custody of the Illinois Department of Human Services for treatment to restore fitness, entered on February 20, 2003, in St. Clair County, Illinois, as well as the resulting treatment of the defendant.[1]

<u>FACTS</u>[2]

The defendant was born in 1966 and had a traditional, middle-class upbringing in East St. Louis and Bellville, Illinois. After graduating from college and working a short time, he married in the early 1990s. Around that same time, the defendant returned to school and, in 1998, received a Doctor of Osteopathy degree (from what is now called Kansas City University of Medicine and Bioscience). From July 1, 1998, to July 1, 2000, the defendant worked as a first- and second-year resident in the pathology department of Wake Forest University Baptist Medical Center ("WFU"). From July 1, 2000, to November 1, 2001, he served as a

---

[1] The defendant's counsel did not contest the authenticity of either set of records or request the sealing of any mental health-related records (nor would such a request likely have had any basis given that the records apparently already appear in unsealed form in the Illinois court files).

[2] Unless otherwise noted, the recited facts come from the Pretrial Services Unit's report, the defendant's proffer at the detention hearing, and/or the agent's testimony at the detention hearing.

third-year resident in the pathology department of St. Louis University School of Medicine ("SLU"). The defendant and his wife separated in 2000 and divorced in 2001. She continues to reside in Forsyth County, North Carolina. Their teen-aged daughter attends school in Durham, North Carolina.

"On July 18, 2005, [the defendant] filed [his first] suit [against SLU making, inter alia,] . . . claims of religious and disability discrimination . . . [in the form of] hostile work environment and wrongful termination arising out of his 2000-2001 tenure at SLU." <u>Kaminsky v. Saint Louis Univ. Sch. of Med.</u> ("<u>Kaminsky I</u>"), No. 4:05CV1112CDP, 2006 WL 2376232, at *4 (E.D. Mo. Aug. 16, 2006) (unpublished) (confirming dismissal of some claims as untimely and granting summary judgment for SLU on remainder), <u>aff'd</u>, 226 Fed. Appx. 646 (8th Cir. 2007). In that litigation, the defendant stated "his transfer [from WFU] to SLU was motivated by marital problems he was having with his then-wife in North Carolina." <u>Id.</u> at *1. Indeed, the defendant "testified that he had previously met Dr. Carole Vogler, the director of SLU's pathology program, and called to see if he could transfer to SLU. He told her the reason he <u>wanted to move</u> was <u>because he wanted to separate from his wife</u>." <u>Id.</u> (emphasis added).

However, in an attachment to an Amended Complaint he filed in this Court on December 8, 2008, the defendant claimed he "was 'forced out' of [WFU's] residency program due to [his impending] divorce," because WFU "refused to accommodate [his] religious belief." Amended Compl., Ex. E at 1, <u>Kaminsky v. Wake Forest Univ.</u>

-4-

Baptist Med. Ctr. ("Kaminsky III"), No. 1:08CV882, dismissal
recommended, 2009 WL 3208449 (M.D.N.C. Sept. 30, 2009) (Sharp,
M.J.) (unpublished), and 2010 WL 2583513 (M.D.N.C. June 22, 2010)
(Sharp, M.J.) (unpublished), recommendations adopted, slip ops.
(M.D.N.C. Nov. 5, 2009 and July 19, 2010) (Beaty, C.J.)
(unpublished), aff'd, 410 Fed. Appx. 609 (4th Cir. 2011); see also
Amended Compl. at 4 (alleging he "was forced to transferred
[sic]"), 5 (stating he was "displaced"), 6 (asserting that WFU's
"unlawful employment practices . . . resulted in [his]
displacement"). According to the defendant, he "[f]iled an EEOC
complaint against [WFU] sometime around the year 2000 . . . [but]
the religious discrimination was not at that time fully explained
to the EEOC or exactly understood by [the defendant] at the time as
[he] did not know [WFU's] true motive for [its] discrimination.
The charge was sort of just 'dropped' by the EEOC." Id.[3]

---

[3] Nor was the defendant's theory of alleged religious discrimination by WFU
"fully explained" in his litigation in this Court. In his Amended Complaint, the
defendant asserted that he had a "religious and civil right to obtain [a]
divorce" and that WFU subjected him to a hostile work environment and disparate
treatment because it was a "Christian employer" (which, by implication, opposed
divorce). Amended Compl. at 7, Kaminsky III. However, in objecting to the
dismissal recommendation, the defendant suggested that he encountered conflict
with WFU because, as a Catholic, he did not respect the Baptist faith:

> [The defendant] was raised Catholic. [He] views and views [sic] the
> Baptist religion as a lesser evil since the "pastor" is less trained
> than a Catholic Priest and is also able to marry and have children.
> [The defendant] views the Baptist minister or pastor as an average,
> everyday man with a wife and family, compared to a Catholic Priest
> with a Doctorate in Theology who spent four years after college in
> pursuit of religious knowledge. The Baptist pastor may hold a job
> as a cigarette machine operator, yet, preaches down to a physician,
> a graduate of a medical college. The [defendant] began to have
> problems with his religious and legal right of obtaining a divorce
> (continued...)

-5-

"Shortly after his arrival at SLU [in July 2000], [the defendant's] instructors began . . . report[ing that he had] problems both of competence and of attitude." Kaminsky I, 2006 WL 2376232, at *1. In his first lawsuit against SLU, the defendant acknowledged "that he began experiencing psychiatric symptoms of aggression while at SLU . . . ." Id. The defendant attributed these symptoms "to his martial problems, the separation from his young daughter, and the harsh environment at SLU. He allege[d] that his supervisors and others harassed him because SLU, as an organization associated with the Catholic Church, did not approve of his divorce." Id. (emphasis added). "Dr. Vogler admitted that she discussed [the defendant's] impending divorce with him on multiple occasions, but only because his martial problems were affecting his work performance, not because she believed [the defendant], as a Catholic, was wrong to seek a divorce." Id. Despite a referral to SLU's Employee Assistance Program, the defendant's "work reviews did not improve, and as a result, SLU placed [him] on probationary status . . . [and ultimately his] contract was not renewed . . . [such that his] training at SLU officially ended on or around October 31, 2001." Id. at *2.

"During [and after his] residency at SLU . . . [the defendant] made obscene phone calls and sent intimidating letters to Drs.

---

[3](...continued)
while employed with [WFU]. This led to a downward spiral forcing the [defendant] to quit [WFU's] pathology residency training program and therefore, employment with [WFU].

Objections to Recommendation at 12, Kaminsky III.

Vogler and [Robert] Heaney [SLU's Associate Dean of Graduate Medical Education] and their staffs." Id. (emphasis added). The defendant "d[id] not deny this conduct . . . [and] admit[ted] that he may have done things that were perceived as 'scary,' 'hostile,' and 'aggressive' by SLU's employees, but contend[ed] that his conduct was caused by the oppressive and abusive environment that SLU had created for him." Id. (emphasis added).

"In January, 2002, the Missouri Department of Health and Senior Services' Bureau of Narcotics and Dangerous Drugs (BNDD) received a complaint which alleged that [the defendant] self-prescribed a controlled substance, Phentermine, under the alias Richard Johnston on two separate occasions in September and October, 2001." Id. (emphasis added).[4] The defendant "did not dispute these allegations, and as a result, the BNDD issued him a Letter of Censure . . . ." Id. "He was ultimately charged in St. Louis County with two counts of fraudulently obtaining or attempting to obtain a controlled substance, a class D felony. He pled guilty to reduced misdemeanor charges in 2004 . . . ." Id.

"Beginning on June 24, 2002, [the defendant] participated in a Transitional Internship Program at Forest Park Hospital in St. Louis." Id. "On October 24, 2002, [his supervisor] was informed by the BNDD that [the defendant's] federal and state controlled

---

[4] Government's Exhibit 2 contains a copy of a psychiatrist's report that identifies Phentermine as a "diet pill" and documents the defendant's admission that, in late 2000, he "weighed over 300 pounds [and] . . . started using Metabolite regularly. . . . [He reportedly] lost almost 100 pounds within one year . . . [but] minimize[d] or denie[d] the excessive use of diet pills." Report to Ct. of Jagannath Patil, M.D., dated Mar. 13, 2003, at 2.

-7-

substance registrations had been revoked due to the drug charges pending against him." Id. The defendant "was dismissed from Forest Park's program on November 1, 2002 . . . based in part on the registration revocations and [on his] failure to cooperate with the hospital's investigation of the matter, as well as on other instances of unprofessional conduct observed by staff there." Id.

"In December, 2002, [the defendant] was charged with six counts of criminal conduct, including harassment by telephone, violation of an order of protection, and obstructing a peace officer in St. Clair County, Illinois. These charges arose out of his harassment and threatening a former girlfriend, violating an order of protection she had obtained against him, and then threatening a witness." Id. at *3 (emphasis added). That court ordered Dr. Daniel J. Cuneo, a clinical psychologist, to evaluate the defendant (then in custody at a local jail) "for the purpose of establishing an opinion as to his fitness to stand trial." Letter from Dr. Daniel J. Cuneo to Hon. Dennis G. Hatch, dated Dec. 16, 2002, at 1.[5] Dr. Cuneo interviewed the defendant (twice) and members of his family; in addition, Dr. Cuneo reviewed documentary materials related to the underlying criminal case, as well as "letters that [the defendant] sent to the [Federal Bureau of Investigation ("FBI")] . . . ." Id.

Dr. Cuneo thereafter reported that the defendant's "thinking at times was delusional and these delusions were primarily paranoid

_____

[5] A copy of said letter appears within Government's Exhibit 2.

in nature. His delusional system [w]as primarily centered around his past relationship with Ms. Lisa Ross[, the former girlfriend he was charged with threatening and contacting in violation of a protection order,] and his belief that she may have been a National Security Agent or an FBI agent." Id. at 2. The defendant stated that he met Ms. Ross "in April 2001 and that they had gone out for two months. She in turn broke off the relationship and [he became] obsessed with her." Id. "In June 2001, [the defendant] had come to Ms. Ross' employment at Dillard's [department store] where he was <u>charged with harassing Ms. Ross</u>." Id. The defendant "explained that this occurred after the night that she told him that she did not want to get married." Id. (emphasis added).

The defendant's brother "bonded [him] out after the incident at [Ms. Ross's jobsite] . . . ." Id. at 2-3. According to the defendant's brother, the defendant thereafter "became increasingly paranoid and felt that the airplanes that were flying over his home might be FBI spying on him." Id. at 3. During the evaluation, Dr. Cuneo asked the defendant "if he felt [Ms. Ross] was an FBI agent [and] he stammered, 'I have no idea. There are women around me who could be her, so I don't look. She's a flake or an FBI agent.'" That response was "consistent with [the defendant's] handwritten addition to his November 17, 2002 correspondence to [an] Assistant Director of Investigation with the FBI where he wrote, 'There could be multiple people representing her (Ms. Ross). But she is excellent in changing her appearance! TRAINING IN DISGUISES??'" Id. at 2 (all capitals in original).

Delusions of the foregoing sort apparently led the defendant to seek a protection order against Ms. Ross, which culminated in a court proceeding on December 12, 2001. See id. According to Dr. Cuneo, the transcript of that proceeding "indicated that [the defendant] had heard Ms. Ross' voice over the loud speakers in three hospitals' emergency rooms giving him orders." Id.[6] "Specifically, [the transcript documented the defendant as] stat[ing], 'She has been going to three of the emergency rooms that I work at, two in Missouri and one in Illinois, and basically speaking with the administration and getting on the microphone on the overhead speaker and like, you know, saying like weird comments . . . like, you know, should he be here or what are you going to do with this patient.'" Id. Dr. Cuneo had the defendant read the transcript and asked him "to explain what he had meant, [to which] he replied, 'I have no comment. It happened so long ago. I don't hear anything now.'" Id. However, Dr. Cuneo reported that, at the time of the evaluation, the defendant "still fe[lt] that he [wa]s seeing [Ms.] Ross and she [wa]s still after him." Id.

Moreover, Dr. Cuneo observed that the defendant's "paranoid delusions ha[d] now encompassed the court system. He believe[d] that his past attorney . . . has attempted to hurt him and put him in jail despite her being his attorney. He ha[d] also encompassed the judge into his delusional system." Id. at 3 (emphasis added).

_____

[6] According to the defendant, he "work[ed] as an emergency room physician and urgent care physician after [SLU] did not 'renew' his pathology residency contract . . . ." Amended Compl. at 18, Kaminsky III.

-10-

Specifically, the defendant filed a formal complaint against the judge asserting that the judge and the defendant's attorney "'claimed that they were going to "have sex" in the judge's chambers while [the defendant] await[ed] trial.'" Id.

Based on his evaluation, Dr. Cuneo assigned the defendant an Axis I diagnosis of Psychotic Disorder, Not Otherwise Specified ("NOS") and an Axis II diagnosis of Paranoid Personality Disorder. Id. at 4. He also rendered an additional, provisional Axis I diagnosis of Delusional Disorder, Persecutory Type. Id. Further, Dr. Cuneo opined that the defendant's "mental illness . . . [then] substantially impair[ed] his ability to understand the nature and purpose of the proceedings against him and to assist in his own defense." Id. In reaching that conclusion, Dr. Cuneo noted that the defendant "is delusional and these delusions are paranoid in nature. He has acted out on these delusions in the past and they have impaired his judgment . . . ." Id. (emphasis added). Finally, Dr. Cuneo took the view that, "if [the defendant] were provided with a course of inpatient psychiatric treatment, there [wa]s a substantial probability that he would be able to attain fitness [to proceed] within the course of one year." Id.

On February 20, 2003, the St. Clair County court, in reliance, inter alia, on Dr. Cuneo's report, "f[ound] the defendant . . . presently unfit to plead or stand trial and remand[ed] him to the custody of the Illinois Department of Human Services for treatment in accordance with the provisions of [Illinois law regarding restoration of fitness to proceed with a criminal case]." People

-11-

v. Kaminsky, 02-CF-1382, 197, 7872, 7873, 7874, 7875 (Ill. Cir. Ct., 20th Jud. Cir. Feb. 20, 2003) (unpublished) (emphasis added).[7] As a result, the defendant "was admitted to Alton Mental Health Center on February 27, 2003 . . . for treatment." Report to Ct. of Jagannath Patil, M.D., dated Mar. 13, 2003, at 1 (emphasis added).[8] At that facility, the defendant was "prescribed risperidone, an atypical antipsychotic at the dosage of 3 mg. a day." Id. The defendant "tolerat[ed] this medication very well with no adverse effects [and] . . . acknowledge[d] benefits from [it, such] as improvement in frustration and concentration. He report[ed] that he d[id] not feel as aggravated . . . ." Id. at 4.

During this hospitalization, the defendant advised "that he ha[d] been diagnosed as suffering from hypothyroidism since 1989-1990 and ha[d] received Synthroid [to treat that condition] in the past." Id. at 3. "Meanwhile, the [defendant's] admission labs came back indicating [abnormal thyroid-related hormone levels]." Id. He thereafter was "prescribed Synthroid (thyroid replacement medication) for hypothyroidism." Id. at 4.

The psychiatrist who followed the defendant's treatment during this time, Dr. Jagannath Patil, confirmed Dr. Cuneo's prior diagnosis of Psychotic Disorder, NOS, but rendered no other Axis I or Axis II diagnoses. See id. In explaining his conclusions, Dr. Patil noted that the defendant's "overt psychiatric symptoms of

_____

[7] Government's Exhibit 2 contains a copy of said order.

[8] A copy of said report appears in Government's Exhibit 2.

delusional beliefs" emerged during the period in which he experienced dramatic weight-loss (fueled by Metabolite and possible abuse of prescription diet pills, see supra, p. 7 n.4) and in which (despite a prior diagnosis of hypothyroidism) he "was not on any thyroid replacement therapy." Patil Rpt. dated Mar. 13, 2003, at 5. Dr. Patil therefore found it "quite likely that [the defendant's] psychiatric symptoms of delusional beliefs may be secondary to either substance use (Metabolite and diet pills) or [his] general medical condition of hypothyroidism or [a] combination of both." Id. However, Dr. Patil opined that "[i]t is also quite likely that independent functional psychotic pathology was evolving for quite sometime prior to [the defendant's] use of Metabolite/diet pills and [his psychotic symptoms] just happen[ed] to have come to the surface during early 2001." Id. Finally, Dr. Patil concluded that, despite improvement in the defendant's mental condition, see id. at 2, 4, the defendant "continue[d] to exhibit paranoid ideations which interfere[d] with his capacity to have reality based discussions about his strategies, defenses, etc. regarding his court cases with his attorney . . . [such that the defendant remained then] unfit to stand trial [although he was] likely to attain fitness within one year." Id. at 5.

A subsequent report from Dr. Patil reflected that the defendant did become "fit to stand trial with medication." Report to Ct. of Jagannath Patil, M.D., dated May 6, 2003, at 1.[9] In that

---

[9] Government's Exhibit 2 contains a copy of said report.

report, Dr. Patil documented that the defendant "clearly verbalize[d] that he was admitted to Alton Mental Health Center as unfit to stand trial." Id. (emphasis added). Moreover, the defendant "[wa]s able to acknowledge his psychological problems and continued need for meds as well as psychiatric follow-up . . . [although] he continue[d] to rationalize some of his past behaviors and externalize part of the blame." Id. at 3 (emphasis added). Dr. Patil observed that the "[f]ocus of treatment ha[d] been to delineate fact based information versus opinions or perceptions . . . [and that the defendant was] now able to present fact based information." Id. at 2. Because the defendant "[wa]s stable on medications and exhibit[ed] no overt psychiatric symptoms . . . [he had] the capacity to have reality based discussions with his attorney about his strategies, defenses, etc. . . . [and therefore was] fit to stand trial with medications." Id. at 4.

The St. Clair County court evidently accepted the foregoing conclusion, because, on June 10, 2003, the defendant pleaded guilty to violation of a protection order and telephone harassment and received probation. Around that same time, he also lost the right to practice medicine in Illinois and Missouri, but promptly took steps to regain his Missouri license. See Kaminsky I, 2006 WL 2376232, at *3. "On October 15, 2004, [Missouri's medical regulatory board] reinstated [the defendant's] medical license on a probationary status for the purpose of completing a residency training program." Id. He then "submitted an application for SLU's 2005-2006 pathology residency training program in December,

2004." Id. In so doing, however, the defendant "did not reveal that he had an Illinois license that was suspended, and he falsely stated that his Missouri license had been suspended because of a medical illness, instead of revealing that the suspension was a result of the [St. Clair County] criminal charges. He also did not list his experience at Forest Park Hospital or indicate that he had been discharged from that program." Id. (emphasis added).

After SLU declined to accept the defendant back into its pathology residency program, he filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and (after receiving administrative notice of his right to sue) instituted the Kaminsky I litigation raising claims of religious and disability discrimination both as to SLU's refusal to re-admit him in 2005 (and again in 2006) and the events that transpired in 2000 and 2001, as well as for retaliation in connection with SLU's alleged influencing of another hospital to deny him admission to its residency program. See id. at *4. The court "dismissed [the 2000-01 timeframe] claims as time-barred," id., and granted summary judgment on the remaining claims, see id. at *5-11. The summary judgment order specifically noted that the defendant expressly contended that he had a "mental condition in 2000-2001 [that] caused his criminal behavior." Id. at *8 (emphasis added); see also id. at *9 ("[The defendant] claims that Dr. Vogler's harsh treatment triggered the onset of a mental illness that caused him to be aggressive and commit crimes."). Moreover, the court acknowledged that the defendant "suffer[ed] from some form of

mental illness," observed that "medical records produced [in the case] indicated that the [defendant's] mental illness ha[d] been well-controlled with appropriate medication in the past," and reported that the defendant "testified . . . he ha[d] not taken medication for more than a year, and his filings in th[e] case show a pattern of irrational thought that appears consistent with the medical evidence in the record." Id. at *12.[10]

On May 30, 2007, less than a year after the entry of the foregoing adverse judgment in Kaminsky I, the defendant launched another suit against SLU, this time alleging that SLU and numerous other entities, including Missouri's medical regulatory board, Missouri's BNDD, the FBI, the Drug Enforcement Administration ("DEA"), St. Louis County, the St. Louis County Prosecuting Attorney's Office, and the St. Louis Post-Dispatch newspaper, "engaged in a conspiracy to falsely arrest him for prescribing himself phentermine . . . ." Kaminsky v. Missouri ("Kaminsky II"), No. 4:07CV1213(JCH), 2007 WL 2492410, at *1 & n.1 (E.D. Mo. Aug. 29, 2007) (unpublished) (dismissing claims against SLU on res judicata and collateral estoppel grounds). Further, the defendant "allege[d] that [Ms.] Ross [wa]s the driving force behind this conspiracy . . . [and that the conspirators] forced him to involuntarily plead guilty to a crime by using the 'mind-controlling drug, Resperidol' on him . . . [and] used this false arrest and conviction as a pretext for taking away his medical

_____

[10] During the period in which the defendant futilely litigated Kaminsky I (2005-06), he spent 12 months working as an electrician in St. Louis, Missouri.

-16-

license." Id. (emphasis added);[11] see also id. (noting that suit alleged SLU discriminated against the defendant and "collu[ded] with [others] to destroy [him] and [his] medical career").

The court's orders addressing various motions to dismiss highlighted other aspects of the defendant's delusional, frivolous contentions in the Kaminsky II litigation. See, e.g., Kaminsky II, 2007 WL 2956404, at *1 (E.D. Mo. Oct. 5, 2007) (unpublished) (dismissing various claims against St. Louis County and St. Louis County Prosecuting Attorney's Office, including as to "alleg[ation] that the County and the Prosecutor's Office engaged in reverse discrimination by giving [the defendant] 'as many Negro judges and prosecutors as there was available'" (internal ellipses omitted)); Kaminsky II, 2007 WL 2994299 (E.D. Mo. Oct. 11, 2007) (unpublished) (dismissing claims against DEA, including as to allegation that DEA personnel "'threatened and coerced' [the defendant] because he was 'improperly being told to prescribe himself a "weight loss drug"'"). Ultimately, the Kaminsky II litigation ended when mail sent to him by the court came back as undeliverable, leading to the dismissal without prejudice of any surviving claims based on the defendant's failure to keep a current address on file. Kaminsky II, slip op. (E.D. Mo. Feb. 13, 2008) (unpublished).

A short time later, the defendant again was convicted of telephone harassment in Illinois. See People v. Kaminsky, No.

---

[11] "Resperidol' is a not uncommon misspelling of "'Risperdal' . . . the trademark name for risperidone," Boothe v. Quarterman, No. C-06-221, 2007 WL 2908802, at *4 n.2 (S.D. Tex. Oct. 5, 2007) (unpublished). See id. at *5.

07CF2646 (Ill. Cir. Ct., 3d Jud. Cir. Sept. 8, 2008) (unpublished).[12] He received 18 months of probation, see id., but the court issued a warrant for his arrest within two weeks based on a petition alleging he violated probation conditions by failing "to report to his probation officer as directed," to give notice of "any change of residency within 48 hours," and "to return from North Carolina on September 19, 2008," Petition to Revoke Probation at 2, People v. Kaminsky, No. 07CF2646 (Ill. Cir. Ct., 3d Jud. Cir.) (filed Sept. 22, 2008). See People v. Kaminsky, No. 07CF2646 (Ill. Cir. Ct., 3d Jud. Cir. Sept. 22, 2008) (unpublished).[13]

Consistent with the foregoing documentation indicating that the defendant skipped probation in Illinois by relocating to North Carolina, the records of this Court indicate that the defendant reported a Forsyth County address as of December 5, 2008, when he instituted litigation against WFU. See Compl. at 1, Kaminsky III. The recommendations that led to the dismissal of that suit accurately described the defendant's allegations in that case as "rambling and disjointed," Kaminsky III, 2009 WL 3208449, at *1; Kaminsky III, 2010 WL 2583513, at *1. In sum, he alleged that:

1) WFU forced him out of its pathology residency program in 2000 because it disproved on religious grounds of his planned divorce and, as a result, he suffered a chain reaction of events

_____

[12] A copy of said judgment appears in Government's Exhibit 1. It does not reflect the offense date, but the case number suggests the charge arose in 2007.

[13] Government's Exhibit 1 contains a copy of said petition, order, and warrant.

culminating in his involuntary conviction for criminal offenses, faulty diagnoses of mental illness (that he acknowledged resulted in "inpatient treatment in a mental hospital"), as well as professional ruin, <u>see</u> Amended Compl. at 1-19, <u>Kaminsky III</u>; and

2) WFU retaliated against him for filing claims with the EEOC and discriminated against him based on his religion, age, and (errant) record of mental disability by failing to accept him back into its pathology residency program in 2005 and 2006, <u>see</u> <u>id.</u>[14]

Since 2006, the defendant has held no employment, except for approximately three weeks in October 2010, when he worked at a restaurant in Durham. He has continued to take Synthroid, but has discontinued any medication for mental illness. In 2009, the defendant was charged with a number of different vehicular-related infractions in Forsyth County and failed to appear in state court.

Late in the evening of October 12, 2010, the defendant reported to law enforcement that he had been robbed of his book-bag at gunpoint while walking along a street in Durham. <u>See</u> Defendant's Ex. 2. Records of a firearms dealer in Greensboro, North Carolina, reflect that, on October 23, 2010, the defendant

_____

[14] Although the defendant's Amended Complaint appears to deny he ever had a mental illness, its attachments do not. <u>See</u> Amended Compl., Ex. C at 1 (stating, in letter to WFU's pathology department dated October 5, 2005, "I had an undiagnosed mental disorder during my pathology residency. I was subsequently successfully treated for this mental disorder for a period of two years with both medication and counseling and am in remission."), Ex. E at 1 (stating, in undated document titled "ADDITIONAL DETAILS OF DISCRIMINATION BY EMPLOYER," "I continued my pathology residency at [SLU] and continued having psychiatric symptomotology [sic]. I had to leave [SLU] because of psychiatric symptoms and a hostile, discriminating work environment that caused me serious life problems. I was subsequently diagnosed with 'psychosis, [NOS]' and treated with psychotropic medication and counseling for a period of two years."), <u>Kaminsky III</u>.

-19-

purchased a 9mm rifle and that, on November 1, 2010, the defendant traded said rifle for a 9mm handgun.  In each of those transactions, the firearms dealer's records document the defendant as answering "No" to the question of whether he had "ever been adjudicated mentally defective (which includes a determination by a court . . . [that the purchaser was] incompetent to manage [his] own affairs) OR . . . committed to a mental institution."

On the evening of December 30, 2010, local law enforcement officers seeking to arrest the defendant on state warrants for obtaining property by false pretenses (apparently related to the same firearms purchases underlying his instant charges) located the defendant in his vehicle in the parking lot of a retail business in Forsyth County, North Carolina.  At that time, the defendant was living in his vehicle in that parking lot  (with – according to the defendant – the permission of the property owner).  When the officers placed the defendant under arrest, the 9mm handgun (that the dealer's records reflected he recently had obtained) fell from his person (specifically, from under a blanket with which he was covered).  It was loaded with a round chambered (because, his attorney proffered, he feared another robbery).  The defendant remained in state custody until his detention hearing in this case.

DISCUSSION

In evaluating the issue of release or detention, the Court has considered the following statutorily-prescribed factors:  "(1) the nature and circumstances of the offense charged . . .; (2) the weight of the evidence against the [defendant]; (3) the history and

characteristics of the [defendant] . . .; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release."  18 U.S.C. § 3142(g). Based on the record before it, the Court makes the following findings of fact and/or conclusions of law:

1) the nature and circumstances of the offenses charged against the defendant are serious and raise significant concerns about the risk of danger his release would pose, <u>see, e.g.</u>, <u>Dickerson v. New Banner Inst., Inc.</u>, 460 U.S. 103, 116 (1983) ("A person adjudicated as a mental defective may later be adjudged competent, and a person committed to a mental institution later may be deemed cured and released.  Yet Congress made no exception for subsequent curative events.  The past adjudication or commitment disqualifies.  Congress obviously felt that such a person, though unfortunate, was too much of a risk to be allowed firearms privileges."), <u>abrogated in part by statute on other grounds as recognized in</u> <u>Yanez-Popp v. United States Immigration & Naturalization Serv.</u>, 998 F.2d 231, 236 (4th Cir. 1993); <u>United States v. Yancey</u>, 621 F.3d 681, 685 (7th Cir. 2010) (describing "the mentally ill [as] more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms"); <u>United States v. Midgett</u>, 198 F.3d 143, 146 (4th Cir. 1999) (observing that defendants with "proven history of mental instability . . . [fall within] class of persons who by reason of their status, Congress considered too dangerous to possess guns" (internal quotation marks omitted)); <u>United States v. Burhoe</u>, 578

F. Supp. 2d 195, 204 (D. Me. 2008) ("[T]he charge is possession of a firearm by a person previously involuntarily committed to a mental health institute, an alleged violation of 18 U.S.C. § 922(g)(4). This crime is potentially very serious and carries significant potential penalties."); 18 U.S.C. § 3142(g)(1) (identifying question of whether offense "involves a . . . firearm" as among important factors in assessment of nature of offense);

2) the weight of the evidence against the defendant is overwhelming, in that:

A) law enforcement officers found the defendant in actual possession of a 9mm handgun;

B) the records of a firearms dealer revealed that the defendant had obtained the 9mm handgun by trading in a 9mm rifle he previously had purchased from the same dealer;

C) the same records reflect that, in each transaction, the defendant denied that he had "ever been adjudicated mentally defective (which includes a determination by a court . . . [that he was] incompetent to manage [his] own affairs) OR . . . committed to a mental institution";

D) prior to those transactions, a court (relying on the reports of mental health experts, at least one of whom had diagnosed the defendant as mentally ill and so delusionally paranoid that he could neither exercise judgment nor cooperate with his attorney) found the defendant unfit to stand trial and remanded

him to a mental health facility for treatment to restore him to competence;[15]

E) prior to his acquisition of the firearms in question, the defendant made statements (including in litigation) confirming that he knew he had been confined in a mental health facility for treatment to restore his competency to proceed with a criminal case;[16] and

F) none of the other technical elements of the offenses (such as the licensed status of the firearms dealer and/or the interstate nexus as to the 9mm handgun) appears subject to reasonable dispute; and

3) the history and characteristics of the defendant raise the following concerns regarding the risk of non-appearance and risk of danger that his release would present:

---

[15] Confinement in a mental health facility for purposes of restoration of competency to proceed in a criminal case constitutes "commit[ment] to a mental institution" under 18 U.S.C. § 922(g)(4) (and thus, by implication, 18 U.S.C. § 922(a)(6)). Midgett, 198 F.3d at 144-48. In addition, "[t]he phrase 'adjudicated as a mental defective' [under 18 U.S.C. § 922(g)(4) and therefore impliedly 18 U.S.C. § 922(a)(6)] is satisfied by a court determination that an individual lacks the mental capacity to contract or manage her own affairs. [The defendant] meets the standard because [after a preliminary psychological evaluation a] court found [him] 'mentally incompetent to the extent that [he] [wa]s unable to understand the nature and consequences of the proceeding against [him] or to assist properly in [his] defense . . . .'" United States v. White, 620 F.3d 401, 420 n.27 (4th Cir. 2010) (internal citations omitted).

[16] Under 18 U.S.C. § 922(a)(6), "the Government b[ears] the burden of proving beyond a reasonable doubt that [the defendant] knew [he] was making false statements in connection with the acquisition of firearms." Dixon v. United States, 548 U.S. 1, 5-6 (2006). A conviction under 18 U.S.C. § 922(g)(4), however, does not require proof that the defendant knew of his prohibited status. See generally United States v. Butler, 637 F.3d 519, 523-24 (5th Cir. 2011).

A) the defendant has prior convictions in 2003 for violating a protective order and making harassing telephone calls and in 2008 for making harassing telephone calls;

B) separate and apart from the foregoing incidents that resulted in criminal convictions, the defendant engaged in aggressive and threatening behavior toward work-place colleagues in and around 2000-01;

C) the defendant skipped probation immediately after its imposition in 2008;

D) the instant offense conduct occurred while the defendant was wanted on a warrant for violating the foregoing probation;

E) the defendant has a prior conviction in 2004 for conduct related to his fraudulent prescribing of controlled substances that involved use of an alias (as to which an administrative finding of responsibility also was made in 2002);

F) the defendant made false statements and material omissions in seeking to resume his medical career in 2004;

G) the defendant has held virtually no employment since 2006;

H) the defendant failed to appear in state court on vehicular-related infractions in 2009;

I) the defendant has a prior diagnosis (by at least two mental health professionals) of Psychosis NOS and said professionals have determined that the defendant's mental illness has manifested itself in elaborate, paranoid delusions that include

-24-

persecution by law enforcement and the judicial system, auditory commands, and bizarre sexual, racial, and religious components;

J) the defendant previously has taken the position in litigation that he had a mental illness and that it compelled him to engage in menacing, criminal behavior;

K) despite acknowledging (while in custody) the benefits to him of continuing treatment with anti-psychotic medication, the defendant ceased taking such medication shortly after his release from custody and has not resumed treatment;

L) after discontinuing his anti-psychotic medication, the defendant's delusional views resurfaced and he became more disconnected from reality as time passed (e.g., he first unreasonably perceived the decision of SLU to decline to re-enroll him as a pathology resident as unlawful discrimination and then re-imagined it as part of a sweeping conspiracy – involving his ex-girlfriend, government agencies, and a newspaper – to destroy him);

M) the defendant's untreated mental illness has led him to perceive the anti-psychotic medication he once acknowledged as helpful as a "mind-control" drug used by his tormentors to ruin him; and

N) the defendant recently has taken positions in litigation indicating that he believes he never had a mental illness (although, perhaps as a function of his mental impairment, he failed to appreciate that, in older documents he attached to such filings, he had admitted suffering from mental illness).

Given these findings and conclusions (i.e., the serious nature and dangerous circumstances of the instant offenses, the strength of the evidence against the defendant, and – in particular – the evidence of the defendant's mental instability and related inability to refrain from threatening behavior and to obey judicially-imposed requirements), the record – by a preponderance of the evidence – establishes that no available combination of conditions would reasonably assure the defendant's appearance in court as required and – by clear and convincing evidence – establishes that no such conditions would reasonably assure the safety of others and the community.

Although the defendant likely lacks the capacity to flee to foreign lands, he has shown a willingness to travel substantial distances across the country while under court-ordered conditions that required him to remain in a particular jurisdiction. He also has a history, as a function of his untreated mental illness, of viewing law enforcement officials (or imaginary law enforcement officials) and the court system as persecutors. Further, the defendant has now taken the step of arming himself when he perceives a threat. Under these circumstances, this Court shares a concern recently well-expressed by another court:

> [The defendant] could, at any time, return to his [prior] ways, and not appear at court proceedings as required, requiring the United States Marshals to go find and arrest him. Combined with his mental-health history, the

> Court is concerned that release might put such officers in danger.

United States v. Harmon, No. CR1-1760JB, 2010 WL 3075062, at *7 (D.N.M. July 21, 2010) (unpublished).

Moreover, in light of the defendant's record of acting out in menacing ways, of finding a wide variety of targets for his paranoid delusions, of refusing to accept the need for medication to control his psychotic condition, and now of carrying a firearm, the defendant represents an unreasonable threat to the community and all persons with whom he might come in contact. See United States v. Daniels, No. CR-10-00900-PJH(DMR), 2010 WL 5422563, at *2-3 (N.D. Cal. Dec. 28, 2010) (unpublished) (ordering detention "primarily based upon the troubling combination of a pattern of arrests and convictions for carrying loaded weapons in public, coupled with a largely untreated and potentially dangerous mental health condition"); see also United States v. Sallay, No. 2:11CR015, 2011 WL 1344288, at *5 (N.D. Ind. Apr. 8, 2011) (unpublished) (ruling that, where record reflected defendant's prior failure to take prescribed psychotropic medication, court would "assume[] that [defendant] would remain unmedicated if released on bond . . . [and that] this factor weighs in favor of detention"). The Court further concludes that the residential program proposed by the defendant would not alleviate any of the foregoing concerns regarding risk of non-appearance and risk of danger, most notably because it lacks any (much less an intensive) mental health component, see Defendant's Exhibit 1.

The words used by another court in a different context ring true in this case as well: "The effects of the [defendant's] mental illness on [his] function in life are fairly characterized as tragic. . . . [He] clearly is a person of substantial natural intelligence. This is recognized as such by the mental health professionals who have treated or evaluated [him], and is evidenced by [his past] achievement[s] . . . ." In re Reynolds, 303 B.R. 823, 831 (Bankr. D. Minn. 2004). The tragic nature of the situation, however, does not alter the fact that, over the better part of a decade, the defendant has shown an inability to conform his conduct to the reasonable requirements of society. As a result, the Court has determined that, if released under any available conditions, the defendant presents an unacceptable risk of non-appearance and of danger to others and the community.[17]

**IT IS THEREFORE ORDERED** that the oral motion for detention by the United States is **GRANTED**. Pursuant to 18 U.S.C. § 3142(e)(1), the defendant is committed to the custody of the Attorney General of the United States or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant shall be afforded a reasonable opportunity for private consultation with defense

---

[17] The Court's conclusion in this regard does not represent a determination that all defendants with some record of mental illness warrant detention under 18 U.S.C. § 3142(e)(1). Indeed, this Memorandum Opinion contains such extensive detail about the defendant's history to make clear that the detention decision does not rest upon the mere existence of prior mental health issues.

counsel.  On order of a court of the United States or request of an attorney for the Government, the person in charge of the corrections facility shall deliver the defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 2, 2011